UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

-against-

LOUIS MCINTOSH,

Defendant.

11 Cr. 500 (SHS)

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

On August 22, 2013, a jury convicted defendant Louis McIntosh of one count of conspiracy to commit robbery in violation of the Hobbs Act, 18 U.S.C. § 1951 (Count One); one count of attempted Hobbs Act robbery (Count Three); two counts of committing Hobbs Act robbery (Counts Five and Seven); four counts of using, carrying, or possessing firearms in connection with the Hobbs Act counts, in violation of 18 U.S.C. § 924(c) (Counts Two, Four, Six, and Eight); and three counts of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g) (Counts Nine, Ten, and Eleven).[1]

Defendant has now moved pursuant to Federal Rule of Criminal Procedure 29(c) for a judgment of acquittal and pursuant to Federal Rule of Criminal Procedure 33 for a new trial in the interest of justice. Because there was insufficient evidence of defendant's intent to rob the participants of the Cliff Street dice game, the Court grants defendant's Rule 29(c) motion as to Counts Three and Four. The Court denies that motion as to the remaining counts because the evidence introduced at trial was

---

[1] The indictment as submitted to the jury was redacted to remove references to McIntosh's co-defendants who were not tried with him, and to remove counts that were not lodged against McIntosh. Throughout this Opinion, the Court follows the numbering convention used in that version of the indictment.

sufficient to support the jury's guilty verdict. The Court denies defendant's Rule 33 motion because the interest of justice does not warrant a new trial.

**I.    THE COURT GRANTS DEFENDANT'S RULE 29 MOTION AS TO COUNTS THREE AND FOUR, AS INSUFFICIENT EVIDENCE SUPPORTS THE JURY'S VERDICT ON THOSE COUNTS. THE COURT OTHERWISE DENIES THAT MOTION.**

**A.  Standard**

"A defendant challenging the sufficiency of the evidence that was the basis of his conviction at trial bears a heavy burden." *See United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008) (quotation marks omitted). The Court must "view the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *See id.* (quotation marks omitted). The Court must "sustain the jury's verdict so long as *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See id.* (quotation marks omitted). However, "[i]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *See id.* at 71 (alteration omitted).

With respect to the issue of venue, although the Court also reviews that evidence "in the light most favorable to the government, crediting every inference that could have been drawn in its favor," *see United States v. Smith*, 198 F.3d 377, 382 (2d Cir. 1999) (quotation marks omitted), venue "need be proved only by a preponderance of the evidence," and not beyond a reasonable doubt, *see United States v. Davis*, 689 F.3d 179, 185 (2d Cir. 2012). "Where, as here, a defendant is charged with multiple crimes in a single indictment, the government must satisfy venue with respect to each charge." *See id.* "Because the Hobbs Act criminalizes a particular type of 'robbery' — *i.e.*, one that 'obstructs, delays, or affects commerce,' [18 U.S.C.] § 1951(a) — venue for a substantive Hobbs Act charge is proper in

any district where interstate commerce is affected or where the alleged acts took place." *See id.* at 186 (quotation marks omitted). For alleged acts, "to support venue," however, "what is begun or continued in a district must be part of the actual charged crime, not merely steps preparatory to the crime." *See id*.

### B. There was Insufficient Evidence that McIntosh Intended to Rob the Narcotics Dealers at the Cliff Street Park (Counts Three and Four).

Count Three charged defendant and others with attempting to "rob individuals they believed to be narcotics dealers" in a park on Cliff Street in Yonkers, New York on April 30, 2010, in violation of the Hobbs Act, 18 U.S.C. § 1951. Count Four charged defendant with using, carrying, or possessing a firearm discharged during the commission of that attempted robbery, in violation of 18 U.S.C. § 924(c).

At trial, the government introduced evidence that on April 30, 2010, defendant and his fellow conspirators gathered in Mount Vernon and then set off in two vehicles to rob "some pounds of marijuana" from marijuana dealers who lived in a house on Cliff Street in Yonkers, stopping on the way to obtain a shotgun and a pistol they had stored in locations in Mount Vernon. (Tr. at 703, 722.) However, after arriving on Cliff Street in Yorkers, they abandoned that plan because when they went to "check . . . out" the dealers' house, they saw "some people in the backyard having a cookout" and decided that there were "too many people out there" to rob them successfully. (*Id.* at 703–05, 725–26.) They concluded that they would not commit that robbery at that time, and instead they spent the remainder of the afternoon at a nearby park, also on Cliff Street, "hanging out" and playing a dice game with individuals who they knew from the area who were crack cocaine dealers. (*Id.* at 723–24, 728–31.) A fight broke out between defendant and one of those crack dealers, named Biggs, over a communal liquor bottle. (*Id.* at 732–34, 743.) McIntosh went to his truck, took his shotgun from the truck, returned to the park, shot Biggs, and then

3

fled in his truck, all without robbing Biggs or anyone else of anything. (*Id.* at 743–50, 857, 930.)

In his Rule 29 motion, defendant contends that the evidence of his intent to rob Biggs or any other participant in the dice game was insufficient for a reasonable juror to convict him of attempting a Hobbs Act robbery (Count Three) or possessing a firearm in connection with an attempted Hobbs Act robbery (Count Four).

To convict defendant of an attempt to commit Hobbs Act robbery, the government was required to introduce sufficient evidence from which a rational juror could conclude beyond a reasonable doubt that defendant "had the intent to commit th[at] crime." *See United States v. Yousef*, 327 F.3d 56, 134 (2d Cir. 2003).

In support of its argument that there was sufficient evidence of defendant's intent rob the Cliff Street dice game participants, the government cites the following trial testimony: When McIntosh and his crew moved to the park, they came across others they knew from the area as crack dealers and began "hanging out" with them. (Tr. at 724.) Ultimately, they joined with the crack dealers in a dice game. (*Id.* at 730.) McIntosh gave money to a man named Corleon — one of the crack dealers already in the park — to purchase liquor. (*Id.*) McIntosh's sensibilities were offended when Biggs drank directly from the bottle rather than using one of the paper cups that also had been purchased. (*Id.* at 740–41.) After several unsuccessful directions by McIntosh to Biggs not to put his mouth on the bottle to drink, defendant "looked at" Edward Ramirez and certain other members of his crew. Ramirez understood the "look" as a sign that "it was going to be something." (*Id.* at 741.) Ramirez and some of the co-defendants — but not McIntosh — began to discuss "who was going to rob who for what." (*Id.*) Soon thereafter, Biggs "grabbed" the liquor bottle and again "put his mouth on it." (*Id.* at 742.) Defendant grew upset that Biggs had once again failed to use a cup when drinking. McIntosh asked Corleon to pay McIntosh what he had spent for the liquor; Corleon responded that

4

he spent all his money on liquor and refused to repay McIntosh. (*Id.* at 743.)

McIntosh then went to his truck, which was parked nearby, to get his shotgun and soon returned to the game with the weapon. (*Id.*) While Ramirez distracted Biggs, defendant "slapped" Biggs with the shotgun, and Biggs and McIntosh began to struggle over the weapon. (*Id.* at 744–45.) Another co-defendant — Steely — fired a pistol, hitting Biggs. (*Id.* at 856–57.) At that point, "the whole crowd started running," and McIntosh shot and hit Biggs. (*Id.* at 745, 857, 930.) McIntosh, Ramirez, Steely and the other co-defendants promptly drove away in two separate vehicles. (*Id.* at 746.) The rush to the vehicles and the getaway were caught on a surveillance videotape, but the contretemps in the park was not. (*Id.* at 752–54.)

Ramirez testified at the trial that immediately after the fight, McIntosh was "mad because his knee was messed up, mad about — that [they] ain't get nothing. We was talking about how we didn't — we went over [to Cliff Street] to catch jerks, which in street terms means a robbery, and we didn't get nothing. We ended up losing." (*Id.* at 751.) Terrence Duhaney, another co-defendant, testified that McIntosh "was saying that the whole plan was to rob the dice game, but it didn't turn out that way because the guy tried to fight back and end[ed] up getting shot." (*Id.* at 861.) An individual from the same federal jail as defendant, Hibah Lee, testified that defendant had told Lee that at the dice game, defendant went to "his truck to get the shotgun to go in [Biggs's] pocket and teach him a lesson" — that is, "[r]ob him" of "[a]nything that he has in his pockets." (*Id.* at 930–31.)

Drawing all reasonable inferences in favor of the prosecution, the jury was certainly able to conclude beyond a reasonable doubt that defendant assaulted and shot Biggs. The question before this Court, however, is whether there was sufficient evidence for a reasonable juror to conclude

5

beyond a reasonable doubt that defendant also intended to rob Biggs or any other member of the group in the park.[2]

The Court finds that the prosecution failed to meet its burden regarding defendant's intent to commit robbery, an essential element of Count Three. From the evidence admitted at trial, it was at least as likely that McIntosh assaulted Biggs because Biggs repeatedly put his mouth on the communal liquor bottle after McIntosh told him not to, as it was that defendant intended to rob Biggs or his colleagues.

The vast majority of the evidence cited in the government's memorandum establishes defendant's presence at the dice game, his assault on Biggs, and his use of a firearm, none of which permit a jury to infer an intent to commit robbery. (*See* Dkt. No. 191, at 25–29 (citing video and audio recordings, among other testimony).) The "look" that defendant exchanged with Ramirez, moreover, is insufficient to support that same inference. Nor does the evidence that McIntosh and his co-defendants planned other robberies — such as of the barbequing marijuana dealers or a separate robbery they actually committed later on the same day as the shoot-out — relieve the government of its burden to demonstrate that McIntosh intended to commit the specific robbery that was charged in Count Three. As for Ramirez's statement that McIntosh was upset about not getting anything at "Cliff Street" that day, that testimony is equivocal at best as to defendant's intention to rob Biggs, and could equally refer to the crew's plan to rob marijuana from the Cliff Street house with the barbecuers, which had been abandoned earlier in the day.

---

[2] The government did not charge — and does not now argue — that the intended robbery of the barbequing marijuana dealers constituted an attempted Hobbs Act robbery, presumably because there is no evidence that that planned robbery would have affected interstate commerce. *Cf. United States v. Parkes*, 497 F.3d 220, 230–31 (2d Cir. 2007).

Finally, with regard to Duhaney's and Lee's statements suggesting that defendant admitted, after the fact, to a plan to rob Biggs, that equivocal testimony is insufficient for the government to meet its burden. The question, of course, is not whether there is *any* evidence supporting defendant's conviction on the challenged counts, but whether "view[ing] the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility," a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See Hawkins*, 547 F.3d at 70–71 (quotation marks omitted).

Considering: (1) the trial record as a whole; (2) including the considerable evidence that the fight between defendant and Biggs was either primarily or entirely a dispute over Biggs's conduct in drinking directly from a communal liquor bottle and not following McIntosh's directives; and (3) the absence of sufficient inferences that can be drawn in favor of the prosecution's case, the Court concludes that even when "viewed in the light most favorable to the prosecution," the evidence "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence" on the essential element of McIntosh's intent to rob Biggs and his confreres. *See id.* at 71.

Accordingly, a rational trier of fact "must necessarily entertain a reasonable doubt" regarding defendant's guilt on Count Three for attempting a Hobbs Act robbery. *See id.*; *see also United States v. Lorenzo*, 534 F.3d 153, 160 (2d Cir. 2008) (reversing the denial of a motion for acquittal when critical evidence was also "consistent with participation in a wide variety of offenses, and in light of the other evidence, [w]as insufficient to prove . . . intent" as to the charged offense). The Court therefore grants defendant's Rule 29 motion as to that Count.

An essential element of Count Four, possessing a firearm in connection with the crime charged in Count Three, was that defendant was convicted of the "crime of violence" charged in Count Three. *See*

*United States v. Desena*, 287 F.3d 170, 180 (2d Cir. 2002). Since the Court has now directed a judgment of acquittal as to Count Three, it also directs a judgment of acquittal as to Count Four.

### C. There Was Sufficient Evidence that the Lynbrook Robbery Had an Effect on Interstate Commerce and that Venue was Proper (Counts Five and Six).

Count Five charged McIntosh and others with robbing an individual of "money and other items" in Lynbrook, New York on September 26, 2010, in violation of the Hobbs Act. Count Six charged him with using, carrying, or possessing a firearm that was brandished in connection with the Hobbs Act robbery charged in Count Five, in violation of 18 U.S.C. § 924(c).

Defendant's challenges to his conviction on these counts are twofold. First, he contends that there was no evidence from which a rational trier of fact could determine that the Lynbrook robbery had an effect on interstate commerce. Second, he argues that venue in the Southern District of New York was improper given that the robbery was carried out in Lynbrook, which is located in the Eastern District of New York and not the Southern District. The Court considers each argument in turn.

#### 1. There Was Sufficient Evidence that the Lynbrook Robbery had an Effect on Interstate Commerce.

The Hobbs Act provides that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery" violates that Act. *See* 18 U.S.C. § 1951(a). In a Hobbs Act prosecution, "proof that commerce was affected" is a "critical" element. *See United States v. Elias*, 285 F.3d 183, 188 (2d Cir. 2002) (alterations omitted). The effect on interstate commerce "must be proven beyond a reasonable doubt to a jury." *See Parkes*, 497 F.3d at 227. "At the same time, it is well established that the burden of proving a nexus to interstate commerce is minimal." *See Elias*, 285 F.3d at 188. A "showing of a very slight," "potential[,] or subtle effect on commerce will suffice."

*See id.* So too, the effect on commerce may be "postponed[ and] indirect." *See Parkes*, 497 F.3d at 230.

At trial, the prosecution introduced evidence that in late September 2010, McIntosh and an associate approached Robert Rizzatti at Rizzatti's home in Lynbrook while Rizzatti was polishing an antique car in his garage. (Tr. at 113–14.) McIntosh, wearing a face mask and holding a semiautomatic pistol, commanded Rizzatti to kneel down. Rizzatti was initially more amenable than Biggs had been in April to taking directions from McIntosh, and he kneeled. McIntosh then tied Rizzatti with a vacuum cleaner cord, bound him with duct tape, and taped his eyes and mouth shut, before asking "where the money was." (*Id.* at 114–17.) McIntosh tasered Rizzatti's neck "three[ or] four" times when Rizzatti failed to respond. (*Id.* at 119–20.) After "rummaging around," defendant and his companion found approximately $60,000, "wrapped in [$]10,000 packs" hidden in the ceiling, along with a loaded pistol. (*Id.* at 119–21.) Defendant then asked "where's the rest of the money." (*Id.* at 122.) When Rizzatti again failed to respond, McIntosh tasered Rizzatti's genitals for approximately "fifteen to twenty seconds" before leaving with the $60,000. (*Id.* at 122–23.)

Rizzatti testified that the money McIntosh took from the ceiling was "from all [Rizzatti's] work from over the years," and that he was engaged in two business enterprises. (*Id.* at 128.) First, since 1976, Rizzatti had been "self-employed," buying ice cream wholesale from a distributor in the Bronx and selling it to "mom[] and pop[] grocery stores." (*Id.* at 111, 398.) Among the brands of ice cream he sold was Häagen-Dazs, which, according to the testimony, was manufactured in Woodbridge, New Jersey. (*Id.* at 111–12.) In fact, Rizzatti had actually visited that manufacturing facility in the past. (*Id.* at 112, 135.) In addition, the refrigeration unit in the truck that he used to make deliveries of the ice cream had been manufactured in North Carolina. (*Id.* at 112–13.)

9

Rizzatti's second business was loaning money. (*Id.* at 128–35.) Among the loans that he made were two to Michael Wolf, who had a construction and excavation business. (*Id.* at 128.) Wolf testified that when he received the first loan, for $25,000 in 2005, he used it to pay contractors from Tennessee that were working on a "log house" in New York, and who returned home to Tennessee monthly. (*Id.* at 399–400, 545.) The money that Wolf received from Rizzatti was packaged in $2,000 and $10,000 "wrappers." (*Id.* at 400.)

The Court finds, based on the foregoing evidence — considered in its totality — that a jury was entitled to conclude beyond a reasonable doubt that when defendant robbed Rizzatti, that act "obstruct[ed], delay[ed], or affect[ed]" interstate commerce. *See* 18 U.S.C. § 1951(a). "[I]t is sufficient" that the Häagen-Dazs ice cream Rizzatti "purchased from in-state suppliers" through his own business "originated out-of-state." *See Elias*, 285 F.3d at 189. As the U.S. Court of Appeals for the Second Circuit has explained, "the interstate commerce element of the Hobbs Act [is] satisfied when the target of the defendant [is] an individual" if "the assets of a company engaged in interstate commerce [a]re . . . depleted as a result of . . . harm . . . to the individual victim." *See United States v. Wilkerson*, 361 F.3d 717, 729 (2d Cir. 2004). A jury could reasonably infer that the money taken from Rizzatti inhibited his ability to purchase ice cream from the New Jersey manufacturer, and to continue to purchase refrigeration equipment made in North Carolina. Furthermore, the money that Rizzatti lent had at least a "very slight" or "subtle" effect on interstate commerce, as Wolf used those funds to employ contractors who traveled back and forth between Tennessee and New York. *See Elias*, 285 F.3d at 188.

Defendant's reasonable contention that Rizzatti's moneylending business was unlawful, given the high interest rates he charged, *see* Tr. at 399, is irrelevant to the interstate commerce analysis. *See United States v. Needham*, 604 F.3d 673, 682 (2d Cir. 2010) (explaining that a Hobbs Act "interstate nexus may be demonstrated" without regard to whether a

robbery was of a "legal or illegal" business). And defendant's argument that as a matter of law "loan sharking" is not interstate commerce fails to account for the fact that the prosecution elicited specific testimony from Rizzatti and Wolf from which a jury was entitled to conclude beyond a reasonable doubt that Rizzatti's loans affected interstate commerce.

Because there was sufficient evidence of the interstate commerce element of the Hobbs Act charge in Count Five, the Count now turns to defendant's argument that venue was not proper to support the conviction on Count Five.

### 2. *Venue Was Proper.*

As noted, "venue for a substantive Hobbs Act charge is proper in any district where interstate commerce is affected or where the alleged acts took place." *See Davis*, 689 F.3d at 186. As the Second Circuit has "consistently held," "only a *de minim[i]s* showing is necessary to establish the interstate nexus required for Hobbs Act jurisdiction." *See United States v. Silverio*, 335 F.3d 183, 186 (2d Cir. 2003) (per curiam).

Given the Court's finding regarding the interstate commerce element as to Count Five, and Rizzatti's testimony that he purchased ice cream from a wholesale distributor in the Bronx — which is part of the Southern District — a jury could conclude based on the preponderance of the evidence that venue for Count Five was proper in the Southern District of New York. That is, it would be reasonable for a jury to infer that by robbing Rizzatti of a significant sum of cash accumulated in part from his ice cream business, *see* Tr. at 128, defendant caused at least a "very slight effect on" Rizzatti's economic ability to purchase ice cream from the Bronx distributor in the same quantities as before. *See Davis*, 689 F.3d at 186; *Elias*, 285 F.3d at 188–89.

\*   \*   \*

For the foregoing reasons, the Court concludes that there was sufficient evidence to support defendant's conviction on Count Five. As

11

defendant makes no separate challenge to the sufficiency of the evidence supporting Count Six, the Court denies defendant's Rule 29 motion as to both Counts Five and Six.

### D. Sufficient Evidence Supported the Jury's Determination that the Poughkeepsie Robbery Affected Interstate Commerce (Counts Seven and Eight).

Count Seven charged defendant with robbing individuals of their cellular phones "and the proceeds of a card game at a men's club" on October 28, 2010 in Poughkeepsie, New York, in violation of the Hobbs Act. Count Eight charged McIntosh with using, carrying, or possessing firearms, one of which was discharged during the robbery, in violation of 18 U.S.C. § 924(c).

With regard to these counts, defendant's sole argument is that the evidence was insufficient to establish a connection to interstate commerce.

Witnesses testified during the trial that McIntosh and his crew went to a late-night poker game in Poughkeepsie intending to rob the players. (Tr. at 423–48, 868–79.) Once at the game, defendant directed all the players to strip to their underwear and directed one of the players to collect the property of the others, including cellular phones and what amounted to $12,000 in cash. (*Id.* at 437–38, 443–44, 447.) In the course of the robbery, defendant "whacked" one of the players "in the face with [a] pistol," causing the gun to fire a bullet "into the wall or the ceiling." (*Id.* at 440, 875.) The victim began to bleed profusely. (*Id.* at 440–43, 578, 582.) This was not only testified to by the victims and a cooperator, but it was also captured on surveillance videotape and shown to the jury. (*Id.* at 563–64; 586–91; Ex. 701.)

The poker game was a longstanding operation; its proprietor advertised the game through text messages sent to customers, including out-of-state customers. The game employed cocktail waitresses, food service workers, and card dealers; some of those employees were

12

compensated by customers tipping them. (Tr. at 567–72, 606–07, 625.) Zachary Schwartz, a victim, lived in Connecticut and drove from his home in Connecticut to Poughkeepsie on the evening of the robbery to join the game. (*Id.* at 602, 604, 607) He was robbed of $300 in cash that night, money that he testified he "probably" would have wagered later in poker games at the Foxwoods Casino in Connecticut, where he gambled once a week. (*Id.* at 604, 622.) After the robbery, he never returned to the poker game in Poughkeepsie. (*Id.* at 623.) Another victim, Jovan Cooper, traveled from Rhode Island to the Poughkeepsie game once or twice a week in 2010. (*Id.* at 648–50.)

This evidence was sufficient to enable the jury to conclude beyond a reasonable doubt that the Poughkeepsie robbery had at least a "very slight effect on interstate commerce." *See Wilkerson*, 361 F.3d at 726 (quotation marks omitted). By competing for out-of-state customers with Foxwoods, an out-of-state casino, the poker game operated in interstate commerce.[3] As a result of the robbery, the enterprise's employees were deprived of the tips they would have received had the customers finished the evening's rounds. And Schwartz ceased attending the game as a result of the robbery, thereby having an effect on interstate commerce. Defendant's Rule 29 motion for a judgment of acquittal on Count Seven is therefore denied. Because he makes no separate challenge to his conviction on Count Eight, his Rule 29 motion as to that count is denied as well.

### E. There Was Sufficient Evidence for the Jury to be Able to Conclude that Defendant Was Liable for Hobbs Act Conspiracy (Counts One and Two).

Count One charged defendant and others with joining and participating in a Hobbs Act robbery conspiracy from 2009 through 2011 in violation of 18 U.S.C. § 1951. Count Two charged McIntosh with using,

---

[3] As noted above, it is irrelevant to Hobbs Act liability whether the Poughkeepsie game operated lawfully or not. *See Needham*, 604 F.3d at 682.

carrying, and possessing firearms in connection with the conspiracy in violation of 18 U.S.C. § 924(c).

McIntosh's Rule 29 argument as to Counts One and Two is that the prosecution presented no "specific evidence of a conspiracy nor of a specific act of Hobbs Act Robbery." (Dkt. No. 184, at 4.) The Court disagrees.

"In Hobbs Act robbery conspiracy cases, it is the government's burden to establish that defendant knowingly and willingly agreed with two or more individuals to obstruct, delay, or affect interstate commerce, by unlawfully taking property 'by means of actual or threatened force, or violence, or fear of injury.'" *See United States v. Santos*, 449 F.3d 93, 96–97 (2d Cir. 2006) (quoting 18 U.S.C. § 1951(b)). In other words, the prosecution had to establish both: 1) "the existence of a conspiracy" to commit an act prohibited by the Hobbs Act; 2) and defendant's "knowing participation in that conspiracy." *See id.* at 97.[4] The Court finds that the prosecution introduced sufficient evidence regarding both elements.

In Rule 29 challenges to conspiracy convictions, "deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare with the precision of a surgeon's scalpel." *See Hawkins*, 547 F.3d at 70. "[T]he conspiratorial agreement itself may be established by proof of a tacit understanding among the participants, rather than by proof of an explicit agreement." *See United States v. Desimone*, 119 F.3d 217, 223 (2d Cir. 1997).

---

[4] Contrary to defendant's argument, "to establish a Hobbs Act conspiracy, the government does not have to prove any overt act." *See United States v. Gotti*, 459 F.3d 296, 338 (2d Cir. 2006) (quotation marks omitted). Even if there were an overt act requirement, the government adduced sufficient evidence of just that, namely the acts charged in Counts Five and Seven.

14

At trial, the government offered evidence that defendant and his crew would "target" persons engaged in unlawful commercial activities, such as loan sharking and gambling, for forcible robbery. (*E.g.*, Tr. at 684–85.) Defendant and his crew "sometimes" planned the robberies in advance (*id.* at 685), as they did with the intended robbery of the barbecuers (*id.* at 726), the Lynbrook robbery (*id.* at 405–07), and the Poughkeepsie robbery (*id.* at 871–72). The crew would frequently "hang together," often while "planning on doing something." (*Id.* at 690.) Based on this testimony, and the evidence summarized throughout this Opinion regarding the Hobbs Act robberies that McIntosh and his associates actually carried out, a jury was entitled to conclude beyond a reasonable doubt that a conspiracy to commit Hobbs Act robberies existed and that defendant knowingly participated in that conspiracy.

Because defendant's Rule 29 challenge to Count One fails and he makes no separate argument regarding Count Two, his Rule 29 challenge to Count Two fails as well.

### F. Sufficient Evidence Supported the Jury's Verdict as to Counts Nine through Eleven.

Defendant asserts in passing that the evidence was insufficient to sustain a conviction on Counts Nine, Ten, and Eleven, which charged him with being a felon in possession of a weapon in violation of 18 U.S.C. § 922(g). He makes no specific argument in support of this contention, however. Nor would such an argument prevail.

Defendant stipulated that he was a felon at the times that the indictment charged him with violating section 922(g). (Tr. at 1192–93). He also stipulated that the firearms in question were "in or affecting interstate commerce." (*Id.* at 1193–94.) And the government adduced sufficient evidence regarding defendant's possession of each of the firearms charged in Counts Nine through Eleven. (*Id.* at 300–09, 373–76, 410–11, 458–72, 574, 578, 692, 699–700, 842–43, 912–18, 987.) There therefore was adequate evidence to support the jury's findings of guilt on those three counts.

## II. THE INTEREST OF JUSTICE DOES NOT REQUIRE A NEW TRIAL PURSUANT TO RULE 33(A).

Pursuant to Federal Rule of Criminal Procedure 33(a), a "court may vacate any judgment and grant a new trial if the interest of justice so requires." This rule "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *See United States v. Polouizzi*, 564 F.3d 142, 159 (2d Cir. 2009). A Rule 33 motion should be granted "only in extraordinary circumstances." *See United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).

The Court is "satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict" on Counts One, Two, and Five through Eleven. *See United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). As to Counts Five and Six, the jury heard uncontested testimony that McIntosh robbed Rizzatti after using a semiautomatic pistol to command him to kneel down and thereafter tasered him. (*E.g.*, Tr. at 113–14, 122–23.) With regard to Counts Seven and Eight, several witnesses testified that McIntosh pistol-whipped one victim during the Poughkeepsie robbery, causing the weapon to discharge. (*Id.* at 440–43, 578, 582, 875.) As noted above, the evidence was also substantial that McIntosh possessed the firearms in question, notwithstanding his prior felony conviction (Counts Nine through Eleven), and that the Hobbs Act robberies in which he knowingly participated were part of the charged conspiracy (Counts One and Two). *See supra* Sections I.E–F.

To the extent that defendant argues in passing that any of the trial testimony was not credible, the Court concludes that none of the witnesses' testimony was "patently incredible or defie[d] physical realities." *See McCourty*, 562 F.3d at 476. To the contrary, considerable portions of the witnesses' testimony were corroborated by surveillance videos. (*E.g.*, Tr. at 563–64; 586–91; Ex. 701.) The Court accordingly concludes that no exceptional circumstances exist that would warrant

16

usurping the jury's role in assessing the witnesses' credibility and therefore denies defendant's Rule 33 motion.[5]

### III. CONCLUSION

Based on the evidence at trial and the jury's verdict, Louis McIntosh is a violent, felonious predator. Nonetheless, even violent predators are entitled to the protections afforded by the Due Process Clause of the Constitution, see In re Winship, 397 U.S. 358, 364 (1970), and the Court therefore grants McIntosh's Rule 29(c) motion as to Counts Three and Four. The motion is denied as to all other counts. The Court directs that a judgment of acquittal be entered on Counts Three and Four. Pursuant to Rule 29(d), the Court conditionally denies any motion for a new trial should the Court's judgment of acquittal as to Counts Three and Four later be vacated or reversed. Last, defendant's Rule 33 motion is denied.

Dated: New York, New York
January 17, 2014

SO ORDERED:

*[signature]*

Sidney H. Stein, U.S.D.J.

---

[5] Federal Rule of Criminal Procedure 29(d) provides that "[i]f the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed." In addition, "[t]he court must specify the reasons for the determination." Id. If the Second Circuit were to determine as a matter of law that there were sufficient evidence to support defendant's convictions as to Counts Three or Four, this Court would not grant a new trial in light of the considerable evidence regarding defendant's guilt on the remaining counts, as set forth throughout this Opinion.